FILED

MAR 01 2016

Clerk, U.S. District Court
District of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| GORDON MAKARCHUK,<br><br>Petitioner,<br><br>vs.<br><br>LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>Respondents. | Cause No. CV 14-255-M-DLC-JCL<br><br>FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

On October 22, 2014, Petitioner Gordon Makarchuk filed this action under 28 U.S.C. § 2254. On December 14, 2015, Makarchuk was ordered to show cause why his petition should not be dismissed with prejudice as procedurally defaulted. (Doc. 10). Makarchuk timely responded. (Doc. 13). This matter is ready for adjudication.

### I. Background

On September 29, 2003, Makarchuk was charged in Montana's Eleventh Judicial District Court, Flathead County, with felony operation of an unlawful clandestine laboratory. A jury trial was held October 16, 2006.

### A. Trial

At trial it was established that during 2003, Makarchuk lived intermittently

1

in a camper trailer that was located on the Grosswiler Dairy Farm in Flathead County. Although he was not an official employee of the Grosswiler's, Makarchuk did perform some odd jobs around the farm, including mechanic work. Makarchuk resided in the trailer for the majority of 2003, however, it is undisputed that he had a falling out with certain members of the Grosswiler family, including Robin Grosswiler in the days leading up to the discovery of the methamphetamine lab. On September 22, 2003, Robin Grosswiler made a trespassing complaint to which Undersheriff Meehan responded. (Doc. 9-2 at 152). Makarchuk claimed that he lived in the camper trailer located on the property and had been given permission to do so by Robin's husband, Clinton Grosswiler. *Id.* at 153. Meehan was able to arrange an agreement whereby Makarchuk had until 6:00 p.m. the following day to remove his remaining personal items, vehicles, and tools from the farm property. *Id.* at 154.

On September 24, 2003, Deputy Allen responded to the Grosswiler farm following a subsequent trespassing complaint. *Id.* at 168. Upon arrival, Allen made contact with Makarchuk, who had exited the area of the camper trailer, and issued him a citation for criminal trespass. *Id.* at 170. Allen did not notice anything unusual about Makarchuk's demeanor, aside from the fact that he was upset. Likewise, he did not inspect the camper. *Id.* at 178. Allen ultimately escorted Makarchuk off of the property.

On September 26, 2003, Deputy Emerson responded to the Grosswiler farm at approximately 12:40 p.m. in response to a criminal trespass complaint. Emerson located the trailer, observed a light on inside and a dog outside. Emerson identified himself and called out, but there was no response. *Id.* at 185. At that point he requested assistance. Following the arrival of two additional deputies, Emerson again approached the trailer, knocked on the side and yelled for the trailer occupant to come out. *Id.* at 188. A male voice responded from inside the trailer.

Ultimately, Makarchuk came out very quickly, opening the door just wide enough to step out sideways and then quickly shutting and locking the door behind him. *Id.* at 190-191. Emerson smelled a strong chemical odor when the door was opened. *Id.* at 191. Emerson smelled the same strong odor coming off of Makarchuk's person during their interaction. *Id.* at 191-92. From his law enforcement experience, Emerson recognized the odor to be that attributable to a methamphetamine lab. *Id.* at 192. Emerson placed Makarchuk in the back of his patrol vehicle; Makarchuk continued to explain that there had been a misunderstanding and repeatedly asserted Clinton Grosswiler had given him permission to live there. *Id.* at 193. While Makarchuk was in the closed patrol vehicle the smell coming off of his person became so strong that Emerson's eyes and throat began burning. *Id.* at 194. Upon realizing he would be taken into custody, Makarchuk asked that the deputies turn off the light inside the camper;

3

however, he informed them they would have to do so at the breaker box because he had locked the door behind him and did not have a key. *Id.* at 196. Outside the back door of the trailer, the deputies observed a gallon jar with matchbook striker plates sitting in a bluish-purple liquid. *Id.* at 197; 238. Next to the jar was a can of Coleman fuel. *Id.* at 201.

A search warrant was ultimately obtained for the camper and Evidence Technician Keith Hannon testified regarding the search of the camper and seizure of various items. Hannon explained that the following items were recovered during the search: chemical bottles (*id.* at 259), a funnel made out of a bottle Heet gas line antifreeze with cotton inside it (*id.* at 260), a box of pseudoephedrine tablets (*id.*), boxes of book matches (*id.* at 267-8), liquid iodine and iodine crystals (*id.* at 270), hydrogen peroxide (*id.*), table salt (*id.* at 271), Liquid Fire drain cleaner containing sulfuric acid (*id.*), red phosphorous (*id.* at 272), and Red Devil Lye (*id.* at 274). Hannon also recounted observing the matchbook striker plates soaking in a solvent outside the trailer. *Id.* at 254. Hannon testified regarding the manner in which each item would be utilized during the initial stages of manufacturing methamphetamine. *See generally Id.* at 247-298.

The search also revealed a gas generator which consisted of a plastic milk jug connected to a glass bottle by plastic tubing. *Id.* at 276. Hannon explained that the glass bottle would have contained sulfuric acid and salt which would react and

4

produce hydrogen sulfide gas. The gas would come out of the glass bottle through the tube and bubble into the milk jug containing the liquid distilled from the Sudafed, iodine, and the red phosphorous from the matchbooks to create meth oil. *Id.* at 353-354. During the gassing process, the methamphetamine liquid would crystalize and fall to the bottom at which point it would be processed a little further into usable product. Hannon testified that a gas generator would come into play near the end phase of the overall methamphetamine production. *Id.* at 354. Hannon was unable to say if the final product had already been extracted from the milk jug, but he opined that what was in the milk jug was still "a little ways" from reaching the final product of crystal methamphetamine. *Id.* at 356.

The search also revealed a burnt test tube which Hannon testified was likely a homemade pipe used to smoke methamphetamine. *Id.* at 292. Hannon explained that all items necessary to produce methamphetamine were found at the camper. *Id.* at 298. Hannon also testified that it was his opinion that the lab had been operable for some time due to the amount of staining and residue that coated the trailer's interior, the well-worn glassware recovered from the scene, and the fact that the manufacturing components were found strewn throughout the camper and not in one singular place. *Id.* at 299-301.

Forensic Chemist Bonnie Kleitz testified that in September of 2003 eighteen items were submitted to the Montana State Crime Lab for testing. Out of the

eighteen items, Kleitz originally tested seven items. *Id.* at 536. Based upon her testing, Kleitz testified that the items were seized from a methamphetamine lab which had utilized the red phosphorous iodine method of production. *Id.* at 537. Kleitz explained the process of methamphetamine production in great scientific detail and discussed which samples she personally tested as they related to the overall manufacturing process. *See generally Id.* at 539- 568.

Kleitz also testified that on October 11, 2006, an additional request was made by the State to test another item, a liquid sample obtained from the milk jug. Testing revealed that the sample contained methamphetamine. Doc. 9-2 at 562. Kleitz was of the opinion that a meth lab was in place when she submitted her first report, prior to testing the milk jug. From a forensic perspective, the most important piece of evidence to Kleitz was Sample 2 which showed phosphorous with a residue of methamphetamine clinging to it, revealing that the initial methamphetamine production process had already unfolded at the time the lab was discovered. *Id.* at 580-81.

At trial, Makarchuk's defense argued repeatedly that the State could not prove that it was Makarchuk who possessed the laboratory. *See e.g. Id.* at 317-319. The defense contended the State failed to establish that it was Makarchuk that personally brought the precursors into the trailer. Additionally, the defense argued the State could not prove how long the items had been in the trailer or how many

6

days the lab had been operable. *Id.* at 337-341; 478-79; 577. The defense attempted to argue the lab was something that could have been assembled fairly quickly and that Makarchuk had only been in the trailer for a short time on September 26, 2003. *Id.* at 350-51; 406-12. The defense also showed there was no way forensically to tell that Makarchuk was the individual that actually manufactured the substance at issue and that there was no paperwork recovered from the scene to indicate that it was Makarchuk's laboratory. *Id.* at 579-80; 596-7. The inference being that one of the other farm workers or individuals known to frequent the Grosswiler property could have set up the lab during the three day time frame where Makarchuk was to be moving off the property. Makarchuk testified in his own defense. *Id.* at 649-749.

The jury found Makarchuk guilty. He was sentenced to twenty years at Montana State Prison, with ten of the years suspended.

### B. Appellate and Postconviction Proceedings

As set forth in the Order to Show Cause (Doc. 10) Makarchuk filed a direct appeal to the Montana Supreme Court raising four issues. *See* (Doc. 9-4); *see also State v. Makarchuk*, DA 07-0341, 2009 MT 82 (March 18, 2009). The Court denied Makarchuk relief on three of his claims, but granted limited relief in relation to improperly imposed conditions of parole. *State v. Makarchuk*, 2009 MT 82 at ¶¶ 20-31.

Makarchuk then sought to challenge his conviction via a pro se petition for post-conviction relief and raised twenty-two claims,[1] the bulk of which were dismissed by the trial court. Two of Makarchuk's ineffective assistance of counsel claims survived and Makarchuk was appointed counsel. An amended petition was filed adding two additional claims. Due to a breakdown in communication, however, Makarchuk's post-conviction counsel ultimately withdrew or was fired. (Doc. 9-37). New counsel was not immediately appointed, but Makarchuk was advised that a request for counsel could be made at a later date and such request would likely be granted. *Id.* Makarchuk apparently never requested new counsel be appointed and the matter proceeded to hearing. At the hearing, Makarchuk failed to present evidence in relation to his surviving claims and instead raised three entirely new issues. *See generally* (Doc. 9-42). The trial court denied Makarchuk relief holding his newly argued claims to be record based and, therefore, should have been raised in direct appeal and finding that he completely failed to address his surviving claims at the hearing. (Doc. 9-45 at 1-2).

Makarchuk appealed the denial of his post-conviction petition. *Makarchuk v. State*, DA 14-0082, 2014 MT 246N (Br. filed April 14, 2014). The Montana Supreme Court denied Makarchuk relief and affirmed the trial court's denial of the post-conviction petition. *Makarchuk v. State*, DA 14-0082, 2014 MT 246N (Sep.

---

[1] A copy of the claims raised in post-conviction was also filed in this Court as a supplement to Makarchuk's petition. (Doc. 1 at 9-15).

10, 2014).

## II. Makarchuk's Claims

In his petition, Makarchuk raises two broad grounds. First, he asserts he was denied his rights to a fair trial and due process. (Doc. 1 at 4 ¶ 13A). Second, he contends he was denied an "interpreter" of expert testimony. *Id.* at 5, ¶ 13B. Makarcuk also raised various subparts for each claim. *Id.* at 4-5.

## III. Procedural Default

Makarchuk failed to fairly present and exhaust either claim before the Montana Supreme Court. Makarchuk was directed to show cause as to why his petition should not be dismissed with prejudice as procedurally defaulted and was directed to the ways in which he could do so. (Doc. 10 at 9).

A claim is procedurally defaulted if the state court declined to address the issue on the merits for procedural reasons such as waiver or preclusion. *Ylst v. Nunnemaker*, 501 U.S. 797, 802-05 (1991); *Franklin v. Johnson*, 290 F. 3d 1223, 1230 (9th Cir. 2002). A higher court's subsequent summary denial reaffirms the lower court's application of a procedural bar. *Ylst*, 501 U.S. at 803. This is what occurred in Makarchuk's case; the Montana Supreme Court affirmed the trial court's denial of Makarchuk's petition for postconviction relief and did not consider any of the merits of Makarchuk's claims under federal law. Thus, all of his claims are procedurally defaulted. *Ake v. Oklahoma*, 470 U.S. 68, 74-75

(1985); *Collier v. Bayer*, 408 F. 3d 1279, 1284 (9th Cir. 2005). Because Makarchuk has failed to demonstrate either cause and prejudice or actual innocence, his petition should be dismissed as procedurally defaulted.

### A. Cause and Prejudice

Makarchuk may overcome his procedural default if he is able to make "an adequate showing of cause and prejudice" relating to his failure to exhaust his state court remedies. *Strickler v. Green*, 527 U.S. 263, 282 (1999). To make such a showing, Makarchuk needs to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In order to establish cause for a default, Makarchuk must demonstrate that the default is due to an external factor that "cannot fairly be attributed to him." *Id.*, 501 U.S. at 753. The "prejudice" prong is met if Makarchuk can show that each error he alleges –was serious enough to undermine confidence in the outcome of the proceeding. *Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007) (en banc). Makarchuk has not met either prong.

As to cause Makarchuk argues that he relied upon advice from appellate counsel that any "record based" claims meant that an objection had to be raised at trial; otherwise the claims had to be pursued on post-conviction. (Doc. 13 at 3). Makarchuk asserts that he has been diligent in his post-conviction pursuit and has attempted to comply with all requirements. *Id.*

Makarchuk also seems to believe that he may have a jurisdictional argument because in the underlying criminal case firearms were found at the scene which, Makarchuk believes, should have made the case federal in nature. *Id.* In support of this claim, Makarchuk states that the prosecutor mentioned this federal nexus during the settling of the jury instructions. *Id.*

As to the proffered jurisdictional cause, Makarchuk is mistaken in his belief that his case may have been federal in nature and, consequently, that the state trial court lacked jurisdiction. Makarchuk's reference to the jury instruction conference is misplaced. Apparently, the defense proposed an instruction, not grounded in Montana law, and attempted to argue that the chain of custody of some pieces of evidence may have been disrupted. In response, the State countered:

> Prosecutor: The basis—I think the Court has an obligation to instruct the jury on things of the law that is related to this case. Nowhere in this case has there been any mention by the defense or any argument or suggestion that somehow the chain of custody or that this evidence was tampered with, and I think it's confusing. It has not been any issue at all in this case, and I think that all the evidence and samples looked at and analyzed was not objected to, and certainly the lab reports weren't objected to, the photographs and samples weren't objected to. It's not even a Montana case, it comes from – appears to be a federal case, Your Honor, that is—perhaps applicable here.

(Doc. 9-2 at 776-777). The defense ultimately elected to withdraw the instruction at issue. *Id.* at 777. It is clear from this exchange that the discussion of federal law related to a case citation and had nothing to do with whether or the Flathead

11

County Court lacked jurisdiction. There is no basis to excuse the default based upon Makarchuk's misunderstanding of this exchange.

Furthermore, Makarchuk has not demonstrated legitimate cause based upon the advice he received from his appellate counsel. This advice from counsel pertaining to issues that could be raised on direct appeal does not constitute an objective factor external to Makarchuk which prevented him from raising his claims in state court. See *Cook v. Schriro*, 538 F.3d 1000, 1027 (9th Cir. 2008). To the contrary, Makarchuk attempted to raise many claims in his postconviction proceeding and appeal therefrom. The trial court appointed Makarchuk counsel and, after Makarchuk relieved post-conviction counsel, left the door open for alternate counsel to be appointed. The fact that Makarchuk elected to proceed on his own and in so doing failed to adequately present and preserve certain issues does not constitute cause to excuse the default. Makarchuk has failed to demonstrate both cause and prejudice for his default.

### B. Actual Innocence

Makarchuk's procedural default could also be excused if he can make the requisite showing of actual innocence of his conviction for operation of a clandestine laboratory. In this manner, Makarchuk's "claim of innocence…is procedural, rather than substantive" because it allows him to overcome the default and obtain federal review of his constitutional claims on the merits. *Schlup v.*

*Delo*, 513 U.S. 298, 315-16 (1995). This type of claim is not itself a constitutional claim, but rather "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315. To pass through the *Schlup* gateway, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

This standard "permits review only in the 'extraordinary' case," but it "does not require absolute certainty about the petitioner's guilt or innocence." *House v. Bell*, 547 U.S. 518, 538 (2006). *Schlup* requires a petitioner "to support his allegations of constitutional error with new reliable evidence- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence- that was not presented at trial." *Schlup*, 513 U.S. at 324. The habeas court then "consider[s] all the evidence, old and new, incriminating and exculpatory, admissible at trial or not." *Lee*, 653 F. 3d at 938 (quoting *House*, 547 U.S. at 538). On this complete record, the court makes a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.*

Makarchuk states that this Court's assertion that Kleitz found the milk jug to contain methamphetamine is "possibly incorrect." (Doc. 13 at 2). The passage to which Makarchuk refers in this Court's Order to Show Cause (Doc. 10) was this Court's recitation of the procedural background referencing the Montana Supreme

13

Court's opinion. *Id.* at 4. However, in this Court's own independent review of the record, there certainly was adequate testimony presented to infer that the camper trailer contained a clandestine methamphetamine laboratory. The question then turned to who was responsible for possessing the lab. Makarchuk adamantly maintained that he had left the trailer and was wholly innocent of operating the lab. The jury found otherwise.

Makarchuk's "newly discovered evidence" is not of the kind and character required to carry his burden und *Schlup*. He presents a lab result, completed on October 11, 2006, to support his claim. (Doc. 13-1). Makarchuk does nothing to explain how this result supports his contention. Additionally, this is not newly discovered evidence. As set forth above, Kleitz discussed this sample test and the result during Makarchuk's trial and explained that it was her opinion that the milk jug contained methamphetamine. Doc. 9-2 at 562.

Makarchuk also references a letter from Intermountain Forensic Laboratories, Inc. (doc. 1-2 at 13) which he contends is "authoritative reference" that the milk jug sample is consistent with urine and/or waste rather than methamphetamine. The letter provides no such authority. In fact, as Makarchuk previously acknowledged in a prior filing with the trial court, the sample from the milk jug was never tested by Intermountain Labs and the sample was ultimately destroyed. (Doc. 1-2 at 10). The letter from forensic scientist Sally M. Waddle, states in

14

theory there are tests which can be performed to determine if a substance is urine. These include testing for creatinine and urea and specific gravity, as well as utilizing "one's olfactory sense." (Doc. 1-2 at 13). Waddle also noted that Kleitz performed a simple "qualitative drug identification" that identified the liquid sample as containing methamphetamine, although Kleitz's analysis did not identify the quantity of methamphetamine. *Id.* Much like Makarchuk's counsel argued at trial, Weddle opines there is no method to determine the date on which the contents were introduced into the jug. *Id.*

Makarchuk has not established that the milk jug contains urine, rather than methamphetamine. Even if he were able to do so, this does not explain away the presence of the precursors of Heet, pseudoephedrine tablets, boxes of matches, liquid iodine and iodine crystals, hydrogen peroxide, table salt, Liquid Fire drain cleaner, red phosphorous, Red Devil Lye, necessary to manufacture methamphetamine, that were recovered during the search of the camper trailer, in which he was the last person to exit. Furthermore, even if the Court were to disregard all these other materials, Makarchuk does not explain what a milk jug of urine would possibly be doing connected to a glass jar via plastic tubing within the camper trailer or why the liquid in the jug would test positive for and be consistent with methamphetamine. Waddle's letter does not constitute "exculpatory scientific evidence." *See Schlup*, 513 U.S. at 324.

In reality, this information is not really even evidence: a letter from a chemist who never tested the liquid at issue and Makarchuk's bare assertion that he was not responsible for the clandestine laboratory, do not constitute "new reliable evidence" needed to invoke the *Schlup* gateway, much less meet the demanding showing required to establish actual innocence. Moreover, the evidence of all of the other items recovered from the trailer and their known role in methamphetamine production remains unrefuted. Makarchuk is unable to show that "in light of all the evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Smith v. Baldwin*, 510 F. 3d 1127, 1140 (citing *Schlup,* 513 U.S. 298). Makarchuk has failed to make an adequate showing to excuse the procedural default.

## Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules governing § 2254 Proceedings. A COA should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

(2000)). Where a claim is dismissed on procedural grounds, the court must also decide whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 648 (2012) (quoting *Slack*, 529 U.S. at 484).

Makarchuk has not made a substantial showing that he was deprived of a constitutional right. Further, because he failed to present his claims to the Montana Supreme Court, reasonable jurists would find no basis to encourage further proceedings. There are no close questions and there is no reason to encourage further proceedings. A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. Mr. Makarchuk's petition (Doc. 1) should be DISMISSED WITH PREJUDICE as procedurally defaulted without excuse.

2. The Clerk of Court should be directed to enter, by separate document, a judgment of dismissal.

3. A certificate of appealability should be DENIED.

### NOTICE OF RIGHT TO OBJECT
### TO FINDINGS & RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. Makarchuk may object to this Findings and Recommendation within 14

days.[2] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Mr. Makarchuk must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of this action without notice to him.

DATED this 1st day of March, 2016.

_____
Jeremiah C. Lynch
United States Magistrate Judge

---

[2] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.